UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

| | | |
|---|---|---|
| STEVEN MILAZZO, | : | |
| | : | **ECF Case** |
| Plaintiff, | : | |
| | : | |
| v. | : | **COMPLAINT** |
| | : | |
| BANK OF NEW YORK MELLON CORPORATION, | : | Case No.  23-cv-5437 |
| | : | |
| Defendant. | : | |
| | : | |

-----------------------------------------------------------------------x

Steven Milazzo, by his attorneys, as his Complaint against Bank of New York Mellon Corporation ("BNY", "Bank", or "Defendant"), alleges as follows:

## NATURE OF THE CASE

1.      On June 25, 2020, BNY fired Plaintiff Steven Milazzo (a 56-year-old male) after 28 years of exemplary service. As explained below, this termination was discriminatory and retaliatory, and premised on blatantly pretextual grounds.

2.      In October 2019, Milazzo complained to BNY's HR manager that a female employee had made unwanted sexual advances toward him at a work event. After describing that employee's inappropriate behavior, Milazzo asked the HR manager what would happen to a male BNY employee who engaged in the same behavior toward a female colleague. He was told, without hesitation, that a man would be fired.

3.      But BNY took no serious steps to discipline or otherwise address the woman's misconduct, much less fire her. This case is about why that is, and why the Bank, by contrast, fired Milazzo, *for cause* no less, under the thin guise of easily debunked pretext for discrimination and retaliation.

4.      Shortly after Milazzo's complaint, the woman involved at the work event asserted sexual harassment allegations of her own – not against Milazzo, but against her male supervisor with

whom she had a consensual sexual relationship. She hired an aggressive plaintiff's lawyer who threatened a lawsuit that BNY resolved by giving the woman a seven-figure payout.

5.     BNY then set out to address what it came to perceive (based on this incident) as an "old boys' club" and to avoid a reputation as a bank that turns a blind eye to sexual harassment. Steve Milazzo and his supervisor became casualties and scapegoats of BNY's irresponsible pursuit of that goal.

6.     First, rather than investigate Milazzo's complaint of inappropriate sexual misconduct by the woman with any seriousness, the Bank treated his complaint as a headache – an unnecessary complication in BNY's efforts to resolve the woman's unrelated, yet explosive, allegations against the Bank. So BNY buried Milazzo's complaint and took no steps to address the woman's inappropriate behavior toward Milazzo.

7.     Then, in an effort to give the impression that the Bank had addressed the perceived "culture" at BNY and in keeping with a pattern and practice of getting rid of older male employees, the Bank decided to make an example of Milazzo. His 28 years of service and exemplary record made no difference to the Bank – it needed to show that it would not tolerate even the perception, misplaced or not, of an "old boys' club."

8.     Not only was Milazzo an older man, he was also the one pressing a sexual misconduct complaint against a female colleague that the Bank wished he had not made. Thus, because of his age and gender, and in retaliation for making a problematic complaint of sexual misconduct toward the woman employee – BNY fired Milazzo.

9.     Yet BNY did not merely fire Milazzo — it terminated him "for cause." And in the Bank's desperate effort to concoct a purportedly legitimate reason for this adverse action, the best it could come up with was this: *three years ago and on his personal time*, Milazzo went to a strip club with work colleagues and then was party to a private conversation that the Bank concluded was

derogatory towards women (though Milazzo undisputedly said nothing disparaging about women in the conversation).

10. But going to a strip club did not violate the Bank's Code of Conduct, did not involve any illegal behavior, did not affect the Bank's reputation in the least, did not involve any female employees of the Bank and, unlike the woman's behavior towards him, was not an unwanted sexual advance toward a colleague. No employee complained to the Bank about the outing. And Milazzo's participation in the private conversation was equally innocuous – a big nothing.

11. In fact, throughout his entire 28-year career at BNY, not a single woman at the Bank *ever* complained about Milazzo's conduct. To the contrary, he mentored and supported the professional advancement of dozens of women who worked for him over the years, and he has received supportive messages from several women who are outraged at how BNY treated Milazzo.

12. Moreover, the Bank's for cause termination of Milazzo was in direct contrast to the way it treated the female employee about whom he complained for her far more egregious conduct: the Bank addressed her behavior with nothing more than a verbal warning. In doing so, the Bank applied an unfair, "zero tolerance" policy to Milazzo (and other male employees), but did not apply the same standard to women, and in particular to the woman about whose conduct Milazzo complained. The Bank's intentional application of different standards to men and women is illegal gender discrimination.

13. In addition to discriminating against him, the Bank also retaliated against Milazzo for filing his complaint. Indeed, other BNY employees who, unlike Milazzo, actually did engage in serious, egregious workplace behavior have been terminated *without* cause, upon information and belief.

14. In fact, the male supervisor that was the target of the woman's sexual harassment complaint was put on paid administrative leave for approximately three months in exchange for his

cooperation with the Bank's investigation of the woman's complaint and, upon information and belief, was eventually fired *without* cause. Milazzo's termination for cause for comparatively benign behavior reflects the Bank's retaliatory motive.

15.     The Bank had no legitimate basis for terminating Milazzo and certainly no basis for doing so for "cause" as per BNY's own policies and practices. The disingenuous designation resulted in Milazzo losing valuable stock compensation earned over years of hard work and has severely damaged his ability to work again. In fact, nearly three years after his termination, and despite diligent efforts to find work, Milazzo remains unemployed.

16.     In the Bank's zeal to avoid the image of an institution that tolerates inappropriate behavior in the workplace (a laudable goal when correctly applied), to bury his sexual-misconduct complaint against the female employee at a time when BNY was desperate to make peace with her, and to take revenge against Milazzo for complaining about a female employee, BNY fired Milazzo for cause for behavior that did not even arguably rise to the level of cause. With a pretextual basis for that firing, and by treating Milazzo in stark contrast to the female employee whose misconduct he complained about, the Bank acted in a discriminatory and retaliatory manner.

17.     In addition, BNY targeted Milazzo because of his age, in keeping with a pattern of discrimination toward older employees at the Bank over the past several years, including forcing men in their 50s out and replacing them with younger employees with less seniority, just as the Bank did when it terminated Milazzo.

18.     Finally, by terminating Milazzo for "cause," BNY also breached BNY's restricted stock unit award agreements by denying Milazzo both vested and unvested stock to which he was entitled under those agreements.

19.     By this lawsuit, Milazzo seeks redress for the Bank's discriminatory and retaliatory conduct that has ruined his long and distinguished career.

**PARTIES**

20.     Plaintiff is a former employee of BNY and a citizen and resident of the state of New Jersey. At all relevant times, Milazzo meets the definition of an "employee" under applicable statutes.

21.     Defendant The Bank of New York Mellon is a Delaware corporation with a principal place of business at 240 Greenwich Street, New York, New York 10286, and was an "employer" within the meaning of applicable statutes at all relevant times.

**JURISDICTION AND VENUE**

22.     This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and, in particular, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and the Age Discrimination in Employment Act of 1867, 29 U.S.C. § 621 *et seq*, ("ADEA").

23.     The present action satisfies the exhaustion requirement of the ADEA because it has been more than 60 days since Plaintiff timely filed a charge with the EEOC, and it satisfies the exhaustion requirements of Title VII because the EEOC issued Plaintiff a right to sue letter on April 12, 2023.

24.     The Court has supplemental jurisdiction over Plaintiff's related claims for violations of New York State Human Rights Law ("NYSHRL"), New York City Human Rights Law ("NYCHRL"), and for breach of contract pursuant to 28 U.S.C. § 1367(a).

25.     Contemporaneously with the filing of this Complaint, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

26.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including Defendant's unlawful employment practices alleged herein, occurred in this district.

## STATEMENT OF FACTS

**Background**

27.     Steven Milazzo is a 56-year-old male who joined BNY in 1993 as an accountant.

28.     In 1995, Milazzo was asked to help start a new group called Global Liquidity Services designed to maximize the profitability of cash associated with the Bank's custody client base. In short order, Milazzo and his supervisor (the only two members of the group at the time) created a highly profitable group within BNY.

29.     By 2000, the group had grown to about 10 people in New York, along with teams in London and Brussels. Around that time, Milazzo introduced an entirely novel concept in the banking industry: using a website portal to enable institutional clients to trade their BNY short-term investments themselves.

30.     The concept caused BNY's Liquidity business to skyrocket, and from 2001 to 2008 while Milazzo was head of the Bank's Liquidity Services Business, the Bank made hundreds of millions of dollars in revenue as a result of his idea. The Bank also continued its global growth, expanding to Hong Kong, London, Pittsburgh, Los Angeles, and Chicago.

31.     Just before the 2008 financial crisis, Milazzo and his supervisor developed a new "segregation" program within the electronic trading portal they had previously developed. The portal enabled the Bank's hedge fund clients to mitigate significant amounts of trading risk.

32.     The program, like the original portal, was the first of its kind and was soon considered best practice on Wall Street. When Milazzo and his supervisor were fired, the segregation program was making the Bank over $100 million a year and the portal overall made the Bank over $300 million a year. With an astounding 80% profit margin, the business was by far the most profitable at the Bank.

33.     During this distinguished 28-year tenure, no BNY colleague ever complained that Milazzo had treated any female employee inappropriately or disrespectfully, made inappropriate comments to female employees, excluded female employees, or otherwise treated women in the

workplace in any way other than professionally and respectfully. Indeed, the Bank has never even claimed that anyone ever complained about Milazzo's behavior, and to his knowledge, no one ever did.

**The RSU Agreements**

34.     During Milazzo's employment, BNY supplemented his salary and other compensation with awards of restricted stock units ("RSUs"). Each RSU award was made pursuant to a restricted stock unit award agreement (the "RSU Agreements"), which set forth the terms and conditions of the award, including the vesting and payment schedules of the relevant RSUs.

35.     Section 2(b) of the RSU Agreements states that, upon termination of employment *without* cause, vesting ceases and an employee forfeits any right to unvested RSUs.

36.     Section 2(c) of the RSU Agreements states that, upon termination of employment for cause, an employee forfeits *both* vested (but unsettled) RSUs and unvested RSUs.

37.     However, the RSU Agreements also state that if the employee is terminated and thereafter receives any "ex-gratia" payments from Defendant, that employee's RSUs will continue to vest in accordance with the schedule set forth therein.

38.     Specifically, Section 4(c) of the RSU Agreements states:

(c) *Termination Providing Transition/Separation Pay.* Provided that you execute and do not revoke a Transition/Separation Agreement and Release acceptable to your Employer, ***if you cease to be continuously employed with your Employer by reason of a termination by your Employer and in connection with such termination you receive transition/separation pay from the Corporation or your Employer, you will continue to vest in your RSUs*** in accordance with the Vesting Schedule set forth in the Award Notice so long as you fully comply with the applicable covenants provided in Section 3 hereof. For purposes of the foregoing, ***"transition/separation pay" means any severance, redundancy or ex-gratia compensation payment to you from the Corporation or your Employer in connection with your termination of employment that is in excess of the amount payable to you on account of any notice period to which you are entitled pursuant to the terms of your contract of employment or otherwise (or payment in lieu of such notice).***

39.     As set forth in more detail below, Milazzo should have retained and received any vested (but unsettled) RSUs because the Bank's decision to terminate him for cause was not made in good faith. Milazzo also should have retained and received his unvested RSUs, valued at approximately $800,000, because he received "ex gratia" payments after his termination that were not required by his employment agreement.

**BNY's Policy and Practice of Reducing its Male Leadership**

40.     In the months (and indeed years) leading up to Milazzo's termination, BNY engaged in a purported effort to "diversify" its leadership. But the "diversity" euphemism was actually a smokescreen for the Bank's systematic (and illegal) efforts to expel older male executives from the Bank.

41.     As part of this effort, BNY applied a "zero tolerance" policy to misconduct by men, including Milazzo, while treating similar or worse conduct by women leniently.

42.     Sarah Quarterman, the Global Head of Human Resources for Markets, made no effort to conceal the Bank's intentions in meetings discussing the Bank's demographic makeup.

43.     On multiple occasions while reviewing the team's diversity numbers, Quarterman would remark that the team "will not look like this" in the future because it had too many men in leadership roles. Upon information and belief, Quarterman made similar comments in other executive-level meetings about her view that there were too many men in the Bank's executive leadership and that "we need to change that."

44.     Milazzo is also aware of similar statements made by other BNY decision-makers acknowledging that the company wanted fewer older men in leadership positions. In keeping with this stated intention, the Bank treated male employees less favorably than female employees, as set forth herein.

45.     While the goal of remedying a historically male-dominated industry by hiring more women is admirable, the terminations of Milazzo and his supervisor demonstrate that the Bank sought to accomplish this illegally through discriminating and retaliating against older men, in particular by applying a harsh double standard to alleged misconduct.

**Milazzo's October 2019 Complaint to HR About a Female Employee's Sexually Inappropriate Workplace Behavior Toward Him**

46.     In or around October 2019, Milazzo attended a conference in Boston with multiple other BNY employees, including a female employee who was a Vice President and Salesperson for the BNY Liquidity Services Group.

47.     One evening during the conference, this employee repeatedly tried to sit on Milazzo's lap, while trying to show him pictures of her mother and demanding that Milazzo say she was "hot". Milazzo refused, asked her to stop, and eventually walked away because the behavior made him extremely uncomfortable. But the woman followed Milazzo, called her mother, and demanded that Milazzo speak with her mother and tell her she was "hot". Milazzo again refused.

48.     The woman also told Milazzo that she had recently had an abortion. This unsolicited personal information also made Milazzo uncomfortable, and he again did not respond to her.

49.     When Milazzo returned to the office a few days later, he informed his supervisor that he believed the episode was inappropriate and that it had made him uncomfortable. Milazzo's supervisor encouraged Milazzo to inform HR about the incident.

50.     On or about October 24, 2019, Milazzo relayed the incident to HR representative Sarah Quarterman, telling her that he believed the behavior was inappropriate and sexually harassing. Milazzo also provided the names of other employees who had witnessed the misconduct.

51.     During their meeting, Milazzo asked Quarterman what would happen to him (as a male Bank employee) if he had done to a female employee what the woman had done to him. Quarterman

said, without hesitation, that Milazzo would be fired. Quarterman then assured him that the Bank

would investigate his complaint.[1]

52.     Notwithstanding this promise, after one additional interview with HR, Milazzo heard

nothing further about the investigation, its conclusions, or whether the Bank had done anything to

address the female employee's behavior. Indeed, upon information and belief, the Bank merely gave

her a meaningless "confirmation of standards" memo and dropped her annual performance evaluation

to "below expectations" because of the incident. These slaps on the wrist were meaningless: she was

not formally disciplined, was not put on leave during the "investigation," was not suspended, and was

not fired. The Bank all but ignored Milazzo's complaint, and the female employee experienced no

actual ramifications for her sexually harassing behavior of a male colleague.[2]

53.     Milazzo later learned that, after he made his complaint about the female employee,

Sarah Quarterman expressed her concern to Milazzo's supervisor that an investigation into Milazzo's

complaint might have a negative impact on the Bank's ability to deal with her.

54.     More specifically, the female employee's performance over the previous year had

become an increasing concern, according to Quarterman, and she was becoming increasingly hostile

towards colleagues and difficult to work with.

---

[1]     Although Milazzo had never formally complained about the woman before October 2019, he
had witnessed her abusive behavior toward other male employees before.

[2]     Moreover, the female employee also provided false information to BNY in a Code of Conduct
questionnaire, upon information and belief, and the Bank ignored that too. Indeed, every BNY
employee is required annually to complete a Code of Conduct questionnaire, which requires
an answer to the question of whether the employee has a "personal" relationship with any
other Bank employee. Upon information and belief, up until the time she complained about
her relationship with her supervisor, both he and she answered this question falsely. Yet she
was not fired, much less for cause, despite her false answer to the questionnaire.

55.     Quarterman and Barbara Aurecchione, BNY's Global Head of Employee Relations, were concerned that Milazzo's complaint would further exacerbate tensions with her and cause her to seek retribution against the Bank. As a result, Quarterman told Milazzo's supervisor, in sum and substance, that Milazzo's complaint would not be helpful in keeping the female employee under control.

**The Female Employee's Complaint to HR about Her Supervisor's Inappropriate Workplace Behavior and Her Threat to Sue the Bank**

56.     Shortly after Milazzo's complaint about her, the female employee did exactly what the Bank feared: she retained counsel and threatened to sue the Bank for sexual harassment based on allegations that her direct supervisor had engaged in an inappropriate sexual relationship with her in the workplace.

57.     Her complaint about the supervisor set in motion the Bank's discriminatory and retaliatory plan to terminate Milazzo (and his supervisor) for "cause."

58.     In stark contrast to the way it ignored Milazzo's complaint about the female employee, the Bank thoroughly investigated her complaint against her supervisor, the result of which was, upon information and belief, a settlement entailing a seven-figure payment to the woman and accepting her voluntary resignation.

59.     The Bank apparently believed it would suffer no reputational harm if it ignored the sexual harassment complaint of a male colleague, but that it could not similarly ignore a female employee's complaint.

60.     Indeed, Milazzo's complaint about the female employee was an inconvenience to the Bank from the start, and the Bank saw the complaint as the reason for her embarrassing complaint about her supervisor.

61.     For that reason, and because the Bank thought that *serious* claims of sexual harassment only involve men sexually harassing women (not vice versa), the Bank ignored Milazzo's complaint,

did virtually nothing to address his female colleague's misbehavior, and instead rewarded her with a substantial settlement payment.

62.     The bank eventually terminated the supervisor for his egregious workplace behavior, but *without* cause and, upon information and belief, he received his contractual severance. Yet Milazzo – who was supposedly fired for private, benign, and utterly harmless, conduct as discussed in more detail below – was fired for cause resulting in, among other damages, the loss of millions of dollars in stock.

**The Bank Discriminated Against Milazzo Based on His Gender**

**The Bank Had No Basis To Terminate Milazzo for Cause Despite Trying to Manufacture One**

63.     The Bank's desire to get rid of Milazzo (in keeping with its explicit goal of getting rid of men in senior leadership positions generally) and its hostility towards Milazzo for his complaint against his female colleague quickly came to the fore during the Bank's investigation of her complaint.

64.     During that investigation, the Bank obtained the supervisor's personal cell phone, from which it learned of Milazzo's personal trip to a strip club three years earlier and discovered private "What's App" messages between approximately five male Bank employees (on personal cell phones) that constituted harmless (if somewhat indelicate) private jokes among friends. The conversations did not target or seek to offend anyone, and were never shared with anyone else at the Bank.

65.     Nonetheless, and without any complaint having been made against Milazzo (or his supervisor), the Bank swiftly moved to manufacture a basis on which to terminate both, purportedly for cause.

66.     ***First***, during interviews conducted in the investigation of the female employee's complaint against her supervisor, Milazzo soon saw that the Bank was focused on his earlier complaint about her. The fact was so obvious during one interview, that Milazzo told a Bank HR

representative that he believed he was being targeted in that investigation in retaliation for speaking out about the female employee's sexually inappropriate behavior.

67.     Despite being told she "has nothing to do with this," Milazzo was then questioned at length in a later interview about what he knew about the woman's relationship with her supervisor. Milazzo knew nothing about the relationship, which he told the Bank, but the Bank's questions belied the claim that the investigation into Milazzo had nothing to do with the female employee or with Milazzo's previous complaint against her.

68.     And just as the Bank had cavalierly dismissed Milazzo's initial complaint about his female colleague, the Bank also dismissed his complaint of retaliation without a further thought, barely attempting to conceal its efforts to manufacture a basis on which to terminate Milazzo by connecting him to the supervisor's wrongdoing.

69.     **Second**, Milazzo also vigorously protested the Bank's baseless allegations that the private messages and personal trip to a strip club reflected a derogatory attitude toward women in the workplace. He noted that he had never been the subject of a single complaint about his behavior and that certain of his female colleagues at the Bank were upset at how he was being treated during the investigation.

70.     For example, a senior female salesperson who worked for Milazzo and his supervisor was interviewed by Barbara Aurecchione purportedly to discuss ideas about future inclusion training. Instead, Aurechhione spent nearly two hours trying to get the salesperson to provide information that would support terminating Milazzo.

71.     The woman was so upset by the deception and by Aurechhione's efforts to get her to manufacture false allegations against Milazzo (and his supervisor), that she considered filing an ethics complaint against Aurechhione.

72. The salesperson eventually spoke to Sarah Quarterman, who apologized for Aurecchione's behavior, but said that, while she would not dissuade the woman from filing a complaint, she would not encourage her to do so. The female salesperson interpreted Quarterman's statement as a threat that she should not file a complaint, which is in keeping with BNY's culture of dismissing or discouraging complaints that are inconsistent with its preferred narrative and further evidence of its efforts to do whatever it took to get rid of Milazzo.

73. In fact, Quarterman's threat worked, as the salesperson ultimately decided not to file a complaint in the face of the threat, and her concerns about how the Bank treated Milazzo were effectively silenced.

74. Milazzo's protests against the Bank's "charges" fell on deaf ears, however, even though the Bank was unable to come forward with *any* evidence of complaints about Milazzo or other actual wrongdoing, let alone of any behavior that negatively impacted any female employees, as the Bank alleged.

75. That is because no such wrongful behavior ever occurred.

76. **Third**, the Bank also wholly ignored the fact that throughout his career, Milazzo actively mentored and promoted women into senior positions at the Bank. For example, Milazzo promoted Ashley Easton, Collette Dunn, and Allison Liptak to Director positions in his group, which were the highest positions available in the group below Milazzo and his supervisor. Milazzo also mentored Nalini Maharaj and Jennifer Martins, among many other women during his career. Far from creating the derogatory workplace for women that the Bank concocted out of whole cloth, Milazzo consistently supported the advancement and professional development of his female colleagues.

77. The Bank simply ignored all of this, marched through its sham investigation of Milazzo (designed only to find some thin reed on which to base his termination) and moved inexorably towards its desired goal of terminating him for cause.

78.     ***Fourth***, Milazzo's supposed misconduct did not even rise to the level of the Bank's own definition of cause.

79.     Section 4(c) of BNY's Restricted Stock Units Terms and Conditions (the "RSU Terms and Conditions") says, that "cause" means:

> (i)   You have been convicted of, or have entered into a pretrial diversion or entered a please of guilty or nolo contendere (plea of no context) to a crime or offense constitution a felony . . . or to any other crime or offense involving moral turpitude, dishonesty, fraud, breach of trust, money laundering, or any other offense that may preclude you from being employed with a financial institution;

> (ii)  You are grossly negligent in the performance of your duties or have failed to perform in any material respect the duties of your employment . . .

> (iii) you have violated the Corporation's Code of Conduct, or any of the policies of the Corporation or your Employment governing the conduct of your business or your employment;

> (iv)  you have engaged in any misconduct which has the effect of being materially injurious to the Corporation, any Affiliate or your Employer, including, but not limited to, its reputation;

> (v)   you have engaged in an act of fraud or dishonesty, including by not limited to, taking or failing to take actions intending to result in personal gain; or

> (vi)  if you are employed outside the United States, any other circumstances (beyond those listed above) that permit the immediate termination of your employment without notice or payment in accordance with the terms of your employment agreement or Applicable Laws (as defined in Section 5.2).

80.     The only provisions of the RSU Terms and Conditions that even arguably apply to Milazzo's conduct are 4(c)(iii) and (iv). But there can be no reasonable, good faith argument that Milazzo's conduct fell within either provision, nor has BNY ever offered any basis for so concluding.

81.     The private visit to a strip club on his personal time did not bring disrepute to BNY; neither Milazzo or anyone else purported to be representing BNY in connection with the visit; no female co-workers were present or knew about the visit; and such lawful activity outside working

hours is actually not prohibited by BNY's Code of Conduct. Tellingly, the Bank never claimed otherwise.

82.     Indeed, Milazzo had never been made aware in his 28 years at BNY that such private behavior could be grounds for termination (much less for cause), nor is he aware of any BNY employee ever being disciplined, much less fired, for such behavior. Upon information and belief, no employee ever has been.

83.     Neither can the Bank credibly claim that Milazzo's behavior was "materially injurious" to the Bank or its reputation. The Bank only discovered the trip *three years* after it occurred by searching a colleague's personal phone.

84.     In short, the Bank's conclusion that Milazzo's conduct constituted "cause" had no reasonable basis.

### The Bank Applied a Different Standard to Milazzo and Treated Him Differently Than The Woman Who Harassed Him When it Terminated Him for Cause

85.     But even if the Bank could credibly claim that it had a basis to terminate Milazzo for cause (it cannot), the Bank cannot credibly claim that it applied its policy and its definition of cause to Milazzo in the same way it applied it to the female employee about whom he complained. It most certainly did not.

86.     Milazzo's termination for cause was in stark contrast to the way the Bank treated his female colleague for far more serious, inarguably inappropriate workplace behavior, which clearly evidences the Bank's discriminatory motivation and bad faith application of its policy to Milazzo.

87.     Milazzo's conduct involved private, innocuous messages between friends and a trip to a strip club on his personal time. Milazzo did not direct any act or comment toward anyone in the workplace, his conduct did not involve physical touching, and no employee of the Bank was offended by or complained about his conduct. Yet Milazzo was fired for cause, without any warning or opportunity to address the behavior the Bank considered inappropriate.

16

88.     Milazzo's female colleague, on the other hand, engaged in unwanted physical touching and inappropriate comments towards a male colleague at a work-related event, and Milazzo filed a formal complaint against her. Yet she was not subjected to any formal discipline and was not terminated, much less for cause.

89.     The Bank's disparate treatment of Milazzo as compared to the female employee could not be clearer. Indeed, one need look no further than Sarah Quarterman's admission to Milazzo that the woman would have been fired for her inappropriate behavior if she had been a man to know that the Bank's disparate treatment was a conscious and calculated decision to treat male employees, and in particular Milazzo, less favorably than female employees.

**The Bank Also Retaliated Against Milazzo for Complaining About His Female Colleague**

90.     In addition to being discriminatory, the Bank's "cause" termination was in retaliation for Milazzo's complaint about his female colleague's harassment, as evidenced by several facts. First, the decision was inconsistent with the Bank's standard, consistent practice. Indeed, the Bank historically has <u>not</u> terminated employees at Milazzo's level for "cause" even when their behavior – unlike Milazzo's – clearly *does* rise to the level of cause. Instead, its practice is to categorize those terminations as without cause and pay generous severances.

91.     But when it came to Milazzo (and his supervisor), the Bank arbitrarily, capriciously, and inconsistently did the opposite.

92.     Several examples show that the Bank's for cause decision was retribution for Milazzo's complaint about his female colleague. As noted above, her supervisor had a workplace affair with his subordinate. Yet the supervisor, upon information and belief, was fired without "cause" and received his contractual severance, in contrast to Milazzo.

93.     In 2015, the Bank resolved lawsuits brought by the United States Attorneys Office and the New York Attorney General alleging that the Bank had engaged in fraud for more than a decade.

The Bank's alleged victims included New York City pension funds and prominent private investors, along with teachers and police officers. *See* *https://www.nytimes.com/2015/03/20/business/dealbook/bank-of-new-york-mellon-to-pay-714-million-in-foreign-exchange-settlement.html*.

94.     As part of the settlement agreement, BNY was required to end the employment of certain executives involved in the fraud, including a BNY Managing Director. Although the Bank eventually did terminate the MD in compliance with the settlement, it stunningly did *not* do so for "cause," upon information and belief. Instead, the Bank provided him with a substantial severance payment and a hero's sendoff, notwithstanding the fraud BNY acknowledged he helped perpetrate on the Bank's customers and the public.

95.     Even more recently, in 2019, another BNY Managing Director was accused of sexually harassing a female colleague. Upon information and belief, he too was eventually terminated for his behavior, but *without* cause and with a generous severance package despite the determination that he had engaged in inappropriate, sexually harassing behavior towards a female colleague in the workplace.

96.     In short, the Bank has a policy and practice of *not* terminating employees for "cause," even when they engage in inappropriate behavior that plainly meets that definition. But when it came to Milazzo, who did *not* engage in any form of misbehavior (that rose to the level of cause or otherwise), the Bank terminated him for "cause" in contravention of that standard policy and practice.

97.     In its final retaliatory act, the Bank reported Milazzo's termination on his U-5 in a way that has and will continue to impact his ability to work again in banking. Specifically, the Bank reported that "this individual engaged in conduct inconsistent with company policy, standards and expectations of a management-level employee, not securities or regulatory related."

98.     The fact that BNY said Milazzo's supposed offenses were "not securities or regulatory related" is cold comfort. Milazzo's U-5 leaves to the imagination of any potential employer what type of terrible misconduct Milazzo must be guilty of for the Bank to "flag" his U-5 when of course he did not engage in such misconduct. Upon information and belief, the Bank took no such action against his female colleague's supervisor, who engaged in significant workplace misconduct in his affair with his direct report.

99.     The U-5 simply confirms the Bank's irrational desire to destroy Milazzo's career, not only at BNY, but in the financial industry at large, in retaliation for his complaint against his female colleague. And indeed, BNY has thus far succeeded in destroying the career of a 28-year veteran employee: Milazzo has tried desperately for three years to obtain employment in his field, to no avail.

**The Bank Discriminated Against Milazzo Based On His Age**

100.    In tandem with its effort to get rid of male executives, the Bank, including one of its former female CEOs, also embarked on an open campaign to purge its ranks of older executives.

101.    It was common knowledge at the Bank that BNY's Executive Team, including the CEO, had no use for "old bank guys," which was their phrase of choice to describe older employees at the Bank, most of whom had been with the Bank their entire careers.

102.    For example, in mid-2015, Gary Strumeyer, a 55-old who had been with the Bank for 32 years, sued the Bank. According to his Complaint in *Gary Strumeyer v. The Bank of New York Mellon and BNY Capital Markets, LLC*, Case No. 17-5432 (Southern District of New York), he had sought a promotion to the position of President of the Markets Group. An HR representative told Strumeyer that he was "too old" for the position and that the Bank was looking for "young talent."

103.    Strumeyer was passed over for the promotion and then fired a year later because he "was not part of the future" of the Bank. The Bank replaced him with a younger, less qualified employee.

104.   In his lawsuit against the Bank, Strumeyer alleged that the Bank's CEO had ridiculed the Market Group's CFO as "old and forgetful"; referred to members of a Capital Market's regulatory committee as "an embarrassing bunch of old guys"; opined that one of Strumeyer's colleagues was "old but you can still get something out of him"; declared that the Head of Collateral Management "looks so old"; announced that the Markets Group needed a "younger" head of technology; and repeatedly asked an employee in her early sixties about retirement before firing her.

105.   Strumeyer also alleged that the CEO had fired or otherwise forced out several older Bank employees, primarily men over the age of 50, and replaced them with significantly younger employees.

106.   Although that CEO left the Bank in March 2019, the culture of ageism she established at the Bank persisted unabated. For example, during a 2019 "9 Box" review and succession planning meeting at which Milazzo and other bank managers over 50 years old were present, the Bank's HR representative said "this room will not look like this" in a few years, which was a clear reference to the Bank's ongoing effort to get rid of the "old bank guys."

107.   Finally, upon information and belief, the Bank replaced Milazzo with an employee significantly younger than Milazzo with significantly less experience.

**The Bank Breached the RSU Agreements**

108.   Finally, Milazzo's termination for cause also violated the RSU Agreements, in at least two ways.

109.   As set forth above, the RSU Agreements provide that a termination without cause results in an employee keeping vested (but unsettled) stock and forfeiting unvested stock, while a termination for cause results in forfeiting both vested (but unsettled) and unvested stock.

110.   For all of the reasons set forth above, the Bank's decision to terminate Milazzo for "cause" was contrary to its own policies and practices and inconsistent with the way it treats other

employees. As such, the Bank's discretion to terminate an employee for cause was exercised in bad faith when it came to Milazzo and wrongfully caused Milazzo to lose vested (but unsettled) stock.

111.    In addition,  Section 4(c) of the RSU Agreements says that if an employee ceases to be employed "by reason of a termination . . . and in connection with such termination you receive transition/separation pay . . . you will continue to vest in your RSUs . . ."

112.    Section 4(c) goes on to define Transition/Separation Pay as, *inter alia*, "ex-gratia compensation . . . in connection with your termination of employment that is in excess of the amount of your contract of employment or otherwise."

113.    Here, BNY provided Milazzo with compensation that triggered its obligation to continue to allow Milazzo's RSUs to vest. Specifically, BNY informed Milazzo of its decision to fire him on June, 25, 2020, and Milazzo stopped working for BNY on that date.

114.    Nonetheless, the Bank continued to pay Milazzo until July 9, 2020, two weeks after his termination. Because Milazzo was not working during that time, and because the payments were not required to be made for any other reason, the payments were "ex-gratia" compensation payments.

115.    Making such "ex-gratia" payments to Milazzo obligated the Bank under the RSU Agreements to allow his unvested RSUs to continue to vest. The Bank instead terminated Milazzo for cause and declared that he had forfeited his right to the unvested RSUs to which he was entitled.

116.    The Bank breached its contractual obligations to Milazzo, and Milazzo lost valuable unvested RSUs as a result.

**FIRST CAUSE OF ACTION**
**(Gender Discrimination under Title VII)**

117.   Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

118.   Defendant has discriminated against Milazzo on the basis of his gender in violation of Title VII by subjecting him to disparate treatment based upon his gender, including, but not limited to, terminating his employment on the basis of his gender.

119.   As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of Title VII, Milazzo has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

120.   As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of Title VII, Milazzo has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

121.   Defendant's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Milazzo's rights under Title VII for which Milazzo is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Gender Discrimination under NYSHRL)**

122.   Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

123.   Defendant has discriminated against Milazzo on the basis of his gender in violation of NYSHRL by subjecting him to disparate treatment based upon his gender, including, but not limited to, terminating his employment on the basis of his gender.

124.   As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of NYSHRL, Milazzo has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

125.    As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of NYSHRL, Milazzo has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

126.    Defendant's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Milazzo's rights under NYSHRL for which Milazzo is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**(Gender Discrimination under NYCHRL)**

127.    Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

128.    Defendant has discriminated against Milazzo on the basis of his gender in violation of NYCHRL by subjecting him to disparate treatment based upon his gender, including, but not limited to, terminating his employment on the basis of his gender.

129.    As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of NYCHRL, Milazzo has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

130.    As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of NYCHRL, Milazzo has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

131.    Defendant's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Milazzo's rights under NYCHRL for which Milazzo is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation under Title VII)**

132.     Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

133.     Defendant has retaliated against Milazzo because he engaged in protected activity as defined by Title VII by, *inter alia*, terminating his employment and subjecting him to post-termination harassment and trauma.

134.     As a direct and proximate cause of Defendant's unlawful retaliatory conduct in violation of Title VII, Milazzo has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

135.     As a direct and proximate cause of Defendant's unlawful retaliatory conduct in violation of Title VII, Milazzo has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

136.     Defendant's unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Milazzo's rights under Title VII for which Milazzo is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Retaliation under NYSHRL)**

137.     Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

138.     Defendant has retaliated against Milazzo because he engaged in protected activity as defined by NYSHRL by, *inter alia*, terminating his employment and subjecting him to post-termination harassment and trauma.

139.     As a direct and proximate cause of Defendant's unlawful retaliatory conduct in violation of NYSHRL, Milazzo has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

24

140.    As a direct and proximate cause of Defendant's unlawful retaliatory conduct in violation of NYSHRL, Milazzo has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

141.    Defendant's unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Milazzo's rights under NYSHRL for which Milazzo is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Retaliation under NYCHRL)

142.    Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

143.    Defendant has retaliated against Milazzo because he engaged in protected activity as defined by NYCHRL by, *inter alia*, terminating his employment and subjecting him to post-termination harassment and trauma.

144.    As a direct and proximate cause of Defendant's unlawful retaliatory conduct in violation of NYCHRL, Milazzo has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

145.    As a direct and proximate cause of Defendant's unlawful retaliatory conduct in violation of NYCHRL, Milazzo has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

146.    Defendant's unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Milazzo's rights under NYCHRL for which Milazzo is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Age Discrimination under the ADEA)

147.    Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

148.    Defendant has discriminated against Milazzo, who is 56-years old, based on his age by, *inter alia*, terminating his employment.

149.    As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of the ADEA, Milazzo has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

150.    As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of the ADEA, Milazzo has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

151.    Defendant's unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Milazzo's rights under the ADEA for which Milazzo is entitled to an award of punitive damages.

### EIGHTH CAUSE OF ACTION
**(Age Discrimination under NYSHRL)**

152.    Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

153.    Defendant has discriminated against Milazzo, who is 56 years old, based on his age by, *inter alia*, terminating his employment.

154.    As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of NYSHRL, Milazzo has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

155.    As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of NYSHRL, Milazzo has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

156.    Defendant's unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Milazzo's rights under NYSHRL for which Milazzo is entitled to an award of punitive damages.

## NINTH CAUSE OF ACTION
### (Age Discrimination under NYCHRL)

157.     Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

158.     Defendant has discriminated against Milazzo, who is 56-years-old, based on his age by, *inter alia*, terminating his employment.

159.     As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of NYCHRL, Milazzo has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief.

160.     As a direct and proximate cause of Defendant's unlawful discriminatory conduct in violation of NYCHRL, Milazzo has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

161.     Defendant's unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Milazzo's rights under NYCHRL for which Milazzo is entitled to an award of punitive damages.

## TENTH CAUSE OF ACTION
### (Breach of Contract)

162.     Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

163.     Plaintiff and Defendant entered into RSU Agreements pursuant to the terms stated above.

164.     Plaintiff performed his obligations under the RSU Agreements. Defendant did not. Specifically, when Defendant terminated Plaintiff but continued to pay him for a period of time thereafter, it triggered an obligation to allow Plaintiff's unvested RSUs to vest.

165.     Defendant, however, terminated Plaintiff for "cause," and caused Plaintiff to forfeit his unvested RSUs.  This bad faith determination was unfounded and indefensible for the reasons set forth herein.

166.    Defendant deprived Plaintiff of his rights under the RSU Agreements by refusing to pay Plaintiff all of the compensation Plaintiff was entitled to pursuant to the terms of those Agreements.

167.    Plaintiff is entitled to the approximately $800,000 as compensation for the RSUs to which he was entitled, together with interest thereon.

168.    By reason of the foregoing breach of contract, Plaintiff has been damaged in an amount to be determined at trial, plus continuing interest accruing from and after the date of the breach, plus reasonable attorneys' fees and costs.

## ELEVENTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

169.    Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

170.    Defendant's conduct as alleged above constitutes a breach of the implied covenant of good faith and fair dealing. This covenant also requires that neither party to a contract will do anything that injures the right of the other to receive the benefits of the contract.

171.    As part of the covenant of good faith and fair dealing, it is implied that Defendant entered into the RSU Agreements with the intent to abide by the promises set forth therein.

172.    As part of the covenant of good faith and fair dealing, it is implied that Defendant would not terminate Plaintiff's employment or improperly deem any termination to be for "cause" to avoid the promises set forth therein.

173.    As set forth above, Defendant breached the implied covenant of good faith and fair dealing when it exercised its discretion in bad faith by terminating Plaintiff for "cause" where "cause" did not exist.

174.    Defendant's wrongful actions serve as a willful and intentional deception and misrepresentation not expressed by, reserved in, and/or otherwise contemplated by the written terms and conditions of the RSU Agreements.

175.     As a direct and proximate result of the Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be determined at trial, together with costs, interest and attorneys' fees.

**WHEREFORE,** Plaintiff requests that the Court enter judgment:

a.     Declaring that Defendant violated the federal, state, and city laws referenced herein;

b.     Enjoining and permanently restraining Defendant from violating the federal, state, and city laws referenced herein;

c.     Directing Defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

d.     Directing Defendant to place Plaintiff in the position he would have occupied but for Defendant's discriminatory and otherwise unlawful conduct and making him whole for all earnings and other benefits he would have received but for Defendant's discriminatory and retaliatory treatment, including, but not limited to, back wages, front wages, lost stock, and other lost benefits;

e.     Directing Defendant to pay Plaintiff compensatory damages for his mental anguish and humiliation;

f.     Directing Defendant to pay Plaintiff punitive damages;

g.     Directing Defendant to pay Plaintiff liquidated damages under the ADEA;

h.     Directing Defendant to pay Plaintiff's attorneys' fees and costs;

i.     Directing Defendant to compensate Plaintiff for any adverse tax consequences of a lump sum damages payment;

j.     Directing Defendant to pay prejudgment interest; and

k.     Granting such other and further relief that this Court may deem just and proper.

Dated: New York, New York          **PARKER POHL LLP**
       June 26, 2023

By: _____
         M. Todd Parker
         David M. Pohl
         Wendy W. Tannenbaum

99 Park Avenue
Suite 1510
New York, New York 10016
(212) 203-8915
(646) 924-3100 (fax)

*Attorneys for Plaintiff*