# Morgan Lewis

**Ashley Hale**
Partner
+1.212.309.6878
ashley.hale@morganlewis.com

August 2, 2024



**VIA ECF**
Hon. Katherine Polk Failla
United States District Court,
Southern District of New York
40 Foley Square, New York, NY 10007

*Re:*     <u>*Steven Milazzo. v. Bank of New York Mellon Corporation*</u>, **1:23-cv-05437-KPF**

Dear Judge Failla:

We write in response to Plaintiff's letter motion filed on July 24, 2024. ECF 60.[1]

### A. Communication from In-House Counsel and EAS Are Privileged

Plaintiff improperly seeks to drastically expand the Court's ruling to add to the *in camera* review "all investigation communications on [Defendant's] privilege log," without providing any support for his theory that the communications – all involving counsel – somehow do not contain mental impressions and legal advice of lawyers or were somehow not prepared in the anticipation of litigation. *See U.S. v. Adlman*, 134 F.3d 1194 (2d Cir. 1998) ("bare assertion" insufficient to pierce privilege). This expansion would capture nearly every remaining entry on the Bank's 272- and 47-entry long privilege logs.[2]

As explained previously, Barbara Aurecchione, Global Head of Employee Relations, conducted a privileged investigation, at the direction of in-house counsel, after it came to light that Plaintiff – a senior executive at the Bank, *who was number two in command* of a major business unit – brought his subordinate employees to strip clubs while on work trips and engaged in derogatory text messages about women, in violation Bank policies. BNY Mellon has provided Plaintiff with **all** of Ms. Aurecchione's interview notes, which contain **all of the facts** learned through the investigation. Plaintiff then deposed Ms. Aurecchione, including about those notes, Adam Vos, Global Head of Markets, about the decision he made to terminate Plaintiff, and Sarah Quarterman, Global People Business Partner, about the communication of that decision, both to Plaintiff and others at the Bank. Plaintiff thus has all of the facts. He is not entitled to the privileged communications.

Any suggestion that the Bank was not anticipating litigation when it began the investigation is

---

[1] We apologize that this letter is over Your Honor's three-page limit, but a request to deem materials not privileged is an incredibly important issue, and we felt it necessary to cite to the record in response to each of the points made in Plaintiff's letter motion, several of which are, at best, misleading misrepresentations to the Court.

[2] Upon agreement that production would not represent a waiver of privilege, Defendant previously produced several items originally included on Defendant's privilege log (entries 6, 8, 9, 12, 14, 15, 16, and 17).

July 12, 2024
Page 2

factually wrong and defies logic. *See Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 494 (S.D.N.Y. 2019) (protecting investigation documents and communications in part because "the fact that the company's top executive was being accused of potentially serious misconduct by itself provides some circumstantial evidence to support [in-house counsel's] claim that his purpose in conducting the investigation was to provide the company with legal advice"). Moreover, to suggest that the investigation was not in anticipation of litigation because Plaintiff had not yet filed his lawsuit is non-sensical. *See A.I.A. Holdings v. Lehman Bro., Inc.*, 2002 WL 31556382, at *5 (S.D.N.Y. Nov. 15, 2002) ("A lawsuit need not already have been filed for the 'in anticipation of litigation requirement to be met."); *Upjohn v. United States*, 449 U.S. 383, 386–87, 397–402 (1981) (applying work-product protection even though no proceedings against the company were threatened when the documents were prepared). As Plaintiff knows through the testimony of multiple witnesses, and as set forth in his Amended Complaint (Dkt. No. 17 at ¶ 4), a lawyer letter accusing another Bank employee of egregious quid pro quo sexual harassment was received by the Bank from an aggressive and prominent employment counsel. In response to that letter, a phone was produced by the alleged perpetrator that disclosed Plaintiff's strip club visits and improper texts. Not only could those materials have led to heightened damages in the original case, they posed risk to the Bank from others involved in the text and strip club visits and, not surprisingly, led to two litigations. Everything the Bank did was in anticipation of both pending and anticipated litigation.

Highlighting the anticipated legal risk, Ms. Quarterman testified that *during* the privileged investigation and subsequent conversations she recommended terminating Plaintiff without cause so that Plaintiff would receive his restricted stock units **in exchange for a release**. When asked, "Why did you have that view [to terminate without cause]?" she said, "Well . . . I felt that providing [Plaintiff] with his stock would require him to sign an agreement and release which would then, you know, **prevent future litigation**." Quarterman Dep. 345:20-346:3, Ex. A. Ms. Quarterman's testimony confirms the obvious – communications regarding the investigation and resulting decisions (about two highly compensated, senior executives in charge of an extremely important business unit) were fully in anticipation of litigation and necessarily contain legal advice and mental impressions of attorneys, and they should be protected. *See Upjohn v. United States*, 449 U.S. at 395-96 ("A fact is one thing and a communication concerning that fact is an entirely different thing."); *Dominion Res. Servs., Inc. v. Alstom Power, Inc.*, No. 3:16CV00544(JCH), 2017 WL 3575892, at *4 (D. Conn. Aug. 18, 2017) ("[i]t is well-settled that the attorney-client privilege protects communications between counsel and client"); *In re Woolworth Corp. Securities Class Action Litigation*, No. 94 Civ. 2217, 1996 WL 306576, at *3 (S.D.N.Y. June 7, 1996) (finding documents protected as work-product when "all participants knew ... that litigation ... [was a] virtual certaint[y]," and observing that "[a]pplying a distinction between 'anticipation of litigation' and 'business purposes' " in such situations is "artificial [and] unrealistic").

Plaintiff's allegation that the Employee Action Subcommittee's ("EAS") involvement was purely "business" is belied by the record. As Plaintiff knows from the documents he subpoenaed from Jonathan Spirgel (*Spirgel v. Bank of New York Mellon Corporation*, No. 1:23-cv-6082), EAS membership includes the General Counsel, General Counsel-Americas, Global Head of Litigation, Managing Counsel, and Chief Compliance and Ethics Officer (a lawyer). In fact, the *only* member of the EAS who is *not* a lawyer is the Chief Human Resources Officer. The purpose of the EAS is to review employee actions that present legal, reputational, or other risk to the Bank. Why would

July 12, 2024
Page 3

the EAS be composed of the Bank's highest-ranking lawyers if not to provide "interpretation and application of legal principles to guide future conduct or to assess past conduct." *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir.2007). Lawyers are the majority of the EAS membership because involvement "requires a lawyer to rely on legal education and experience to inform judgment" on these important issues. *Id.; see also In re General Motors LLC Ignition Switch Litig.*, 80 F.Supp.3d 521, 530 (S.D.N.Y. 2015) ("Rare is the case that a troubled corporation will initiate an internal investigation solely for legal, rather than business, purposes; indeed, the very prospect of legal action against a company necessarily implicates larger concerns about the company's internal procedures and controls, not to mention its bottom line.").[3] In addition, in testimony Plaintiff fails to cite, Ms. Aurecchione made clear that the EAS does not make the decisions. Aurecchione Tr. 270:15-271:2 ("Yes, 'cause the EAS Committee is not making the decision").[4] The Bank at all times intended the work of the EAS to be privileged and has done nothing to diminish or waive that privilege.

Finally, emails do not need to include counsel in order to be privileged if the parties were acting at the direction of counsel in the course of a privileged investigation. *See, e.g., Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 495 (S.D.N.Y. 2019) (attorney-client privilege covers non-attorneys who were conducting an investigation under the direction of counsel); *S.E.C. v. Strauss*, 2009 WL 3459204, at *6 (S.D.N.Y. Oct. 28, 2009). Plaintiff deposed the non-lawyer note-takers and email authors and they all confirmed **they were at all times acting at the direction of counsel**.

### B. Mr. Nichols and Mr. Wilson Are Not Appropriate Comparators

Neither individual identified by Plaintiff is an appropriate comparator or within the criteria identified in the Court's May 2, 2024 ruling. The applicable part of the Court's Order limited the scope of comparators to other individuals in Markets, in New York City, at the managing director level and above from 2015 through 2020 about whom the Bank was aware of complaints of misconduct. Conf. Tr. 50:12-15, May 2, 2024, Dkt. 42.

Pursuant to the Court's July 29, 2024 Order, we had an additional meet and confer call with Plaintiff's counsel about Nichols and Wilson. We reaffirmed that Mr. Wilson **did not work in New York**. He worked in London. While he visited New York and engaged in activities that led to an investigation, that investigation was completed in the UK, and had to proceed under the unique laws that apply to employees subject to UK law. More specifically, as an individual diagnosed with a medical condition, certain very different steps had to be followed under the occupational health and medical processes applicable under UK law for disciplinary/hearing proceedings, any possible discipline and appeals. Contrary to the *Brown* case Plaintiff's cites, those are NOT the same standards as in the United States. Moreover, Adam Vos, the undisputed

---

[3] Ms. Aurecchione has clarified her response to the question, "But the EAS, just so I'm clear, included legal; right?" Her answer to that question is, "Yes, a lawyer or lawyers from the Legal Department are included as members of that Committee." Aurecchione Tr. 266:25 – 267:6, Ex. B; Aurecchione Errata Sheet, Ex. C.
[4] Plaintiff blatantly misstates the record in claiming that Ms. Aurecchione testified that the EAS "was heavily involved in making recommendations about the termination to Adam Vos." Pl. Ltr. at 2. But nothing in her cited testimony (267:7-23) says that. To the contrary, she testified four times "I do not know" (and three times that she could not remember the sequence) when asked if the EAS made any recommendation. Aurecchione Tr. 254:4-24; 270:15-271:2, Ex. B.

July 12, 2024
Page 4

decision-maker as to Mr. Milazzo, was not involved in that process or in any decision about Mr. Wilson, who did not report to Mr. Vos.[5]

As Plaintiff already knows, Mr. Nichols falls even further outside the Court's Order. First, no Bank employee filed a complaint of misconduct against him. To the contrary, as Plaintiff notes, Mr. Nichols was the subject of actions brought *not* by any co-worker but by, *inter alia*, the United States (Preet Bharara, USA S.D.N.Y.) for civil fraud involving custodial clients who used the Bank's standing instruction foreign exchange service **from 2000 through 2011** – decades before Mr. Milazzo was terminated. *See USA v. BONY and David Nichols*, Case 1:11-cv-06969-LAK Dkt. No. 31 (6/6/12). That case, filed in October 2011, was resolved by a Stipulation and Order of Settlement and Dismissal in March of 2015, requiring, in part, that the Bank would "effectuate the separation of certain employees" … including Nichols." All of this happened before Mr. Vos, the undisputed decisionmaker as to Mr. Milazzo, was even a Bank employee – as he was not hired until 2016. For these myriad reasons Nichols is not temporally or otherwise covered by the Court's Order or a possible comparator.

Respectfully submitted,

*/s/ Ashley J. Hale*
Ashley Hale

c: All counsel of record (via ECF)

---

[5] Plaintiffs letter would have the Court believe Mr. Wilson reported to Mr. Vos. Pl. Ltr. at 3. But Plaintiff leaves out what Mr. Vos testified he meant by the group in London "eventually" reporting to him." As part of the over 600 people worldwide that *indirectly* reported to him, the London team only indirectly "through the reporting structure" "rolled into him," reporting first to "regional management and then … me." Vos Tr. 34-36, Ex. D. There is no testimony that Wilson otherwise "reported" to Vos.

The Court is in receipt of the parties' letters outlining their latest discovery dispute.  (*See* Dkt. #60, 68).

Plaintiff's request for the Court to direct Defendant to submit for *in camera* inspection its investigation communications in addition to the meeting minutes and factual summaries the Court already directed Defendant to submit is DENIED.  After careful consideration of the parties' submissions, those communications appear to be "primarily or predominantly of a legal character."  *Monterey Bay Mil. Hous., LLC* v. *Ambac Assurance Corp.*, No. 19 Civ.9193 (PGG)(SLC), 2023 WL 315072, *6 (S.D.N.Y. Jan. 19, 2023).

Additionally, Plaintiff's request to add Mr. Nichols and Mr. Wilson as comparators is DENIED.  The Court's May 2, 2024 ruling shall be strictly adhered to and the evidence presented as to these two individuals does not counsel in favor of classifying them as potential comparators.

Due to repeated requests for extensions of time, discovery in this matter has been ongoing since December 2023.  (*See* Dkt. #25).  The Court has repeatedly reminded the parties that they were "ordered to file a joint letter within fourteen (14) days of the close of fact discovery, informing the Court if they wish to be referred to a Magistrate Judge for settlement discussions or request the Court schedule a post-fact conference."  (*See, e.g.*, Dkt. #24, 33, 45, 47).  As fact discovery has already concluded, and no such letter was filed, the parties are hereby ORDERED to file a letter on or before **October 18, 2024**, the now current deadline for the close of expert discovery, informing the Court as to the aforementioned issues.

The Clerk of Court is directed to terminate the pending motion at docket number 60.

Dated:    August 7, 2024              SO ORDERED.
         New York, New York

                                      *Katherine Polk Failla*

                                      HON. KATHERINE POLK FAILLA
                                      UNITED STATES DISTRICT JUDGE